## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

MARCUS T. WILLIAMS           *    CIVIL ACTION NO. 05-0571

VERSUS                             *    JUDGE JAMES

JO ANNE B. BARNHART, COMMISSIONER    *    MAGISTRATE JUDGE HAYES
OF SOCIAL SECURITY

### REPORT AND RECOMMENDATION

Plaintiff, Marcus T. Williams ("Williams"), appeals from a decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. The appeal was referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons given below, it is recommended that the decision of the Commissioner be **REVERSED, and this matter be REMANDED to the Commissioner for further proceedings.**

### BACKGROUND

Williams filed an application for SSDI and SSI benefits on May 16, 2003, alleging a disability onset date of February 11, 2003, due to severe degenerative joint disease of his hip, and severe pain in his back, pelvis, and thigh. After a hearing held on July 22, 2004, Administrative Law Judge ("ALJ") Charles R. Lindsay, in a written decision, denied Williams' application. Tr. 13-20. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

Facts and Medical Evidence

At the age of 10, Williams, who was 26 years old at the time of his hearing, first suffered the injury to his hip that would lead him to apply for disability benefits. According to his testimony, during a game of "summer league fastball," he dislocated his left hip as he attempted

to slide into one of the bases. Tr. 152. After having his hip reset and screws inserted in the joint, Williams recovered and, later on in his life, became employed as fast food worker, packager, cleaner, tree trimmer and roll puller. Tr. 14. Over time, however, the joint and surrounding tissue deteriorated to the point that Williams applied for disability benefits in May 2003.

On February 19, 2003, Dr. Belchic, Williams' treating orthopedist, opined in a FMLA "Physician Certification" requested by Williams' employer that Williams would be unable to perform his employment functions for an undetermined time due to severe hip arthritis. Tr. 92. Less than a week later, on February 24, 2003, Dr. Spires, another orthopedist, examined Williams and noted that x-ray results indicated Williams suffered from advanced degenerative joint disease in his hip. Tr. 98. Although Williams complained of chronic hip pain and demonstrated a short-legged gait on his left side, Spires concluded that his age precluded him from consideration for total joint arthroplasty. *Id.* Spires, however, did note in his "Return to Work Recommendations" that Williams could not work because he was totally incapacitated. Tr. 131. After a follow-up visit on March 10, 2003, Spires commented that he felt that Williams would have "to be reclassified to a less strenuous occupation." Tr. 97.

On referral from Dr. Belchic, Williams was examined several times by physicians at the Louisiana State University Health Sciences Center ("LSUHSC") between May and December of 2003. On May 16, 2003, the examining physician recorded that Williams' range of motion in his hip was severely limited and that x-rays showed a severe degenerative collapse of the femoral head of the acetabelum. Tr. 119. A visit two weeks later on May 29, 2003, confirmed those findings. Tr. 118. The examining physician during an examination on June 19, 2003, refused to recommend Williams for surgery, but did approve him for a handicapped parking sticker. Tr. 124. After several months, Williams visited the LSUHSC again on December 19, 2003. During

this examination, the physician characterized Williams' degenerative joint disease as "severe." Tr. 123.

Shortly after being examined at the LSUHSC, Williams completed an "Activities of Daily Living Form" on May 26, 2003, in connection with his disability application. In a section inquiring about his physical abilities, Williams stated that he could not walk very far, perhaps only five minutes, before having to rest for fifteen or twenty minutes. Tr. 81.

In July 2003, the State agency referred Williams to Dr. Simonton for an evaluation. Tr. 106-7. Dr. Simonton described Williams' medical history, and, after conducting several range of motion tests, he concluded that Williams had limited range of motion in his left hip and stood "with the left knee slightly flexed but ambulate[d] with only a mild antalgic gait on the left." Tr. 106. In his final remarks, Dr. Simonton stated that Williams' left hip could only become worse until surgery is ultimately performed, but that his current age removed him from eligibility. Tr. 107. According to Dr. Simonton, Williams' condition limited him from any prolonged walking or standing and necessitated employment in, at least, a semi-sedentary occupation. *Id.* Dr. Simonton did not express any opinion on whether Williams' impairments met or equaled those in the Commissioner's Listing of Impairments, nor did he discuss whether Williams could perform any of the actions described in the definition of "inability to ambulate effectively."

Also in July 2003, Susan Shaver, a reviewer employed by the Commissioner, completed a "Residual Functional Capacity Assessment" form based on a review of Williams' complaints and medical evidence. Tr. 108-15. Although Shaver indicated that Williams possessed moderate exertional limitations consistent with an RFC of sedentary or light-work, she expressed the following opinion on Williams' subjective complaints:

> [Claimant] alleges back and hip pain. He states he does not cook because he is
> unable to stand very long. He can do some laundry but no [household] chores or

3

yard work. He states he is unable to walk very far. He has an MDI that significantly limits his activities. His statements are credible.

Tr. 113. In a section of the form designed to compare the reviewer's opinions with those of the claimant's treating or examining physicians, Shaver indicated that her opinion of Williams' limitations did not significantly differ from Williams' physicians'. Tr. 114.

Little medical evidence exists for the period between December 2003 and July 2004, the month of Williams' hearing before the ALJ. After the hearing, however, on July 30, 2004, Dr. Belchic completed a form entitled "Medical Statement Regarding Hip Problems for Social Security Disability," which contained questions tailored toward assessing equivalency and a claimant's RFC. Tr. 133. With respect to the questions relevant to equivalency, Dr. Belchic, in a section defining "inability to ambulate effectively" according the Commissioner's Listing of Impairments, noted that Williams indeed suffered from such an inability. Tr. 133.

ALJ's Decision

In his decision on September 1, 2004, the ALJ applied the Commissioner's five-step sequential analysis and concluded that Williams was not disabled. After finding that Williams satisfied the first two steps of the analysis, the ALJ turned to the third step: whether Williams' severe impairments, either singly or in combination, met or medically equaled one of the listed impairments in 2 0 C.F.R. Part 404, Subpt. P, App. 1 (hereinafter *Listing*), specifically section 1.02(A) dealing with a major dysfunction of a peripheral weight-bearing joint such as the hip. The ALJ focused on whether the dysfunction created an "inability to ambulate effectively," which is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or

complete activities."[1]  *Id.* at § 1.00(B)(2)(b).  In concluding that Williams could ambulate

effectively, the ALJ briefly discussed the medical evidence in the record:

> The medical evidence discloses the claimant has severe degenerative joint disease
> of the left hip.  Medical evidence shows decreased range of motion in the hip and
> he has a leg length discrepancy on the left.  His treating physician, Dr. Belchic,
> reports the claimant is unable to ambulate effectively.  However, his conclusion is
> not supported by recent examinations, clinical findings, nor is it consistent with
> his previous medical statements, i.e., "not to report to work for 4 weeks."  E.A.
> Conway Medical Center clinic records document the claimant performs his
> activities of daily living and on the musculoskeletal assessment it was noted that
> the claimant's limitation would be no prolonged walking or standing, but did not
> totally rule out walking all together or need for assistive devices.  The claimant
> testified that he uses no assistive devices to aid walking, such as a walker, two
> crutches or two canes.  He is still capable of performing activities of daily living
> as noted above.  He reports he attends church, drives, grocery shops and helps
> with the household chores.

Tr. 15 (internal citations omitted).

Because Williams' impairments did not meet or equal those in the *Listing*, the ALJ

---

[1] The *Listing* further defines "ineffective ambulation" and provides several examples:
> Ineffective ambulation is defined generally as h aving insufficient lower
> extremity functioning . . . to permit independent ambulation without the
> use of a hand-held assistive device(s) that limits the functioning of both
> upper extremities.
> (2) To ambulate effectively, individuals must be capable of sustaining a
> reasonable walking pace over a sufficient distance to be able to carry out
> activities of daily living. They must have the ability to travel without
> companion assistance to and from a place of employment or school.
> Therefore, examples of ineffective ambulation include, but are not limited
> to, the inability to walk without the use of a walker, two crutches or two
> canes, the inability to walk a block at a reasonable pace on rough or
> uneven surfaces, the inability to use standard public transportation, the
> inability to carry out routine ambulatory activities, such as shopping and
> banking, and the inability to climb a few steps at a reasonable pace with
> the use of a single hand rail. The ability to walk independently about one's
> home without the use of assistive devices does not, in and of itself,
> constitute effective ambulation.
> § 1.00(B)(2)(b).

proceeded to assess Williams' RFC for purposes of analyzing whether he could perform his past relevant work or other work in the national economy. After reviewing Williams' testimony and complaints, and concluding that they were not well supported, the ALJ briefly discussed the medical evidence in the record:

> The medical evidence discloses the claimant has severe degenerative joint disease of the left hip and a leg length discrepancy that results in back and hip pain. He is treated with pain medications. Surgical intervention has not been undertaken. A consultative orthopedic examination [by Dr. Simonton] found that even though the claimant had a severe impairment his only limitation would be no prolonged standing and walking. Clinical records from the claimant's primary care source[, Dr. Belchic,] noted he completed activities of daily living and he moved all extremities. [Dr. Belchic] . . . reported extreme limitations in a medical statement of ability to do work related activities.

Tr. 17. While the ALJ concluded that Williams did have some difficulty performing basic tasks from time to time, he "clearly [was] not totally disabled from performing all types of substantial gainful activity." Tr. 17. Accordingly, the ALJ assigned Williams a sedentary RFC, concluded that he could not perform his past relevant work, but, based on a vocational expert's testimony, also concluded that Williams could perform several other jobs that exist in the national economy, such as a telephone clerk and document preparer. Tr. 18

Standard of Review; Substantial Evidence

This Court will uphold an ALJ's determination that a claimant is not disabled if the findings of fact upon which it is based are supported by substantial evidence, and if it was derived from a proper application of relevant legal standards. *See* 42 U.S.C. § 405(g); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). While substantial evidence lies somewhere between a scintilla and a preponderance, substantial evidence clearly requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). Conversely, a finding of no substantial evidence

is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). At no time should the Court "reweigh the evidence in the record, try the issues *de novo*, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

In this case, Williams alleges the following points of error in the Commissioner's five-step sequential analysis: (1) in step three, the ALJ failed to obtain an equivalency opinion from a State agency medical consultant and, therefore, did not base his decision on substantial evidence;[2] and (2) the ALJ, during his RFC assessment, failed to articulate good cause for affording Dr. Belchic's opinions little or no weight. Both claims have merit and justify reversal and remand.

ALJ's Equivalency Determination

A review of the ALJ's decision reveals that his conclusion that Williams' impairments did not meet or equal those in the *Listing* - specifically, that they did create an inability to ambulate effectively - is not based on substantial evidence. The undersigned begins by noting that the record contains only one direct opinion on whether Williams could ambulate effectively, as defined in the *Listing*. Dr. Belchic, Williams' treating physician, offered the opinion that Williams could not ambulate effectively after the hearing and one year after the State agency

---

[2] Williams' primary argument under this claim is that the record does not contain a State agency physician's equivalency opinion, and, according to Social Security Ruling ("SSR") 96-6p, the ALJ should have obtained such an opinion. The Commissioner disputes the meaning of 96-6p and claims that it only requires ALJ's to consider State agency physicians' opinions that exist in the record; it does not require an ALJ to affirmatively seek out such an opinion before rendering a decision. This dispute between Williams and the Commissioner, however, is collateral to the fact that the ALJ's equivalency determination, as a whole, is not based on substantial evidence, and, under a different section of SSR 96-6p, he should have obtained an updated medical opinion on equivalency.

examination by Dr. Simonton. Tr. 133. While the ALJ acknowledged this opinion, he rejected it based on what he described as contrary clinical findings and inconsistent statements. However, the ALJ only noted that the purported contrary clinical findings showed that Williams "performs his activities of daily living" and "moves all extremities." Tr. 15. These same clinical records, though, also state that the range of motion in Williams' hip was severely limited; that he was approved for a handicap parking sticker; and that his condition was "severe." Tr. 118-19, 123-4. Furthermore, given the multi-faceted and fact specific definition of "inability to ambulate effectively," the ability to "move all extremities" and limitation from "prolonged walking and standing" do not adequately address the possibility that Williams' impairments equaled those in the *Listing*, especially given Dr. Belchic's conclusion that they did. Although Dr. Belchic did state on May 20, 2003, that Williams was not to return to work for four weeks, he did not affirmatively say that he was to return to work after four weeks and in fact never released him to return to work. Tr. 100. On July 21, 2003, Belchic stated that the length of time the impairment causing Williams to be unable to return to work would last was "indefinite" and that the length of his total disability from work was "undetermined." Tr. 129, 130. Those statements were made over a year before his later opinion that Williams could not ambulate effectively, and are not inconsistent with that opinion. In sum, the findings and opinions the ALJ used to reject Dr. Belchic's opinion that Williams could not ambulate effectively are either inconclusive or inapposite.

The record also reveals that the ALJ overlooked or failed to discuss several pieces of medical evidence relevant to the equivalence inquiry. Susan Shaver, a Commissioner reviewer assigned to Williams' case, stated that she found Williams' complaints and self-proclaimed limitations to be credible and that her opinions did not significantly differ from Williams' treating

physicians'. Additionally, nowhere in the record is there any discussion of Dr. Spires' seemingly ambiguous opinion that Williams was totally incapacitated and should be reclassified to a less strenuous occupation. Tr. 97. This evidence, while not determinative of equivalence, is as relevant as the evidence the ALJ cited in refuting Dr. Belchic's opinion, and therefore merited at least a cursory discussion.

Given Dr. Belchic's opinion on Williams' inability to ambulate effectively, and the lack of any clearly contrary opinion by another physician, State agency or otherwise, the ALJ was obligated, at the very least, to obtain an updated medical opinion. SSR 96-6p provides that an ALJ must obtain an updated equivalency opinion from a medical expert in two circumstances:

> [1] When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that judgment of equivalence may be reasonable; or [2] When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

61 FR 34466, 34468 (July 2, 1996). The second circumstance was present here. Dr. Belchic's opinions, submitted one week after Williams' hearing, constituted the most direct and conclusive equivalency opinion contained in the record, and if Dr. Simonton's prior opinion was that Williams could ambulate effectively (which is not clear) Belchic's opinion contradicted, or was in conflict with, Dr. Simonton's. Thus, the ALJ was required to get an updated opinion from a medical expert before rendering a finding on equivalence.

Based on the ALJ's lack of substantial evidence to support his equivalency finding and his failure to obtain an updated medical opinion from a medical expert, it is recommended that the Commissioner's denial of benefits be **REVERSED and REMANDED for further proceedings.**

Rejection of Treating Physician's Opinion

In noting the ALJ's brief discussion of the medical evidence during his RFC assessment, Williams alleges that the ALJ failed to articulate good cause for affording Dr. Belchic's opinions little or no weight. According to Williams, the ALJ never offered any reasons for denying Belchic's opinions controlling weight; rather, the ALJ merely quoted the legal standard for assessing treating physicians' opinions, stated that it was the "correct standard," and moved on to whether Williams could perform his past relevant work. Additionally, the ALJ failed to note alleged inadequacies in other non-examining physicians' opinions and also overlooked Dr. Spires's opinion that Williams should not work and should transfer to a less strenuous occupation.

Rather than focus on the ALJ's sparse analysis, the Commissioner, in its reply, conducts its own independent review of the evidence and devotes the majority of its argument to disputing Williams' characterization of the evidence and chronology of events.[3] The Commissioner claims that, based on the ALJ's citation of the legal standard for assessing treating physicians' opinions, "[i]t is readily apparent that the ALJ regarded Dr. Belchic's opinion as being within the scope of the exceptions to the weight ordinarily accorded treating physician opinions . . . and rejected it accordingly." Commissioner's Br., p.7. The more rigorous analysis required under *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000), was not required, the Commissioner argues, because the ALJ's RFC determination was based on other reliable medical evidence.

As a preliminary matter, the Court's review is limited in scope. The Court's job is not to

_____

[3] As an example, the Commissioner challenges Williams' claims (1) that there was a significant deterioration of his condition between February 2003 and May 2003; (2) that Dr. Simonton's opinions were based on old x-rays from February 2003; and (3) that Dr. Simonton's examination predated the "significant deterioration" in Williams' condition.

re-weigh the evidence or conduct a *de novo* review, nor is the Court entitled to substitute its judgment for that of the ALJ's. *See Newton*, 209 F.3d at 452. The only relevant inquiries are whether the ALJ's conclusions are based on substantial evidence and whether the ALJ properly applied the relevant legal standard. 42 U.S.C. § 405(g); *Greenspan,* 38 F.3d at 236. Therefore, to the extent that the Commissioner discusses supportive evidence and raises points that the ALJ did not, it is irrelevant to the Court's inquiry. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455.

A subsection of the Commissioner's regulation dealing with evaluation of treating sources' opinions ends with the statement, "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(d)(2). As a treating source's opinion is given controlling weight if it is well-supported by and consistent with other medical evidence, techniques, and opinions, often such controlling opinions yield little in the way of detailed analysis in ALJ decisions. *Id.* An opinion that is not entitled to controlling weight, however, deserves a much greater discussion under the Commissioner's regulations. Specifically, an ALJ must consider (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the extent to which the opinion is supported by medical evidence; (5) the opinion's consistency with the rest of the record as a whole; (6) the specialization of the treating physician; and (7) other miscellaneous, but relevant, factors. *See id.* at (d)(2)(i)-(ii), (d)(3)-(6); *Newton*, 209 F.3d at 456 (requiring consideration of factors before declining to give little or no weight to a treating source's opinion). Even if a treating source's opinion is not entitled to controlling weight because it is unsupported by or inconsistent with

11

other medical evidence, as the Commissioner argues is the case with Dr. Belchic's opinions, those "opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." SSR 96-2p, 61 F.R. 34490, 34491 (July 2, 1996). In reaffirming the Commissioner's promise that it will always provide "good reasons" for the weight afforded to treating sources' opinions, SSR 96-2p provides that unfavorable decisions:

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

*Id.* at 34492.

The requirement for ALJ's to justify the weight they afford to treating sources' opinions, even those that are unsupported by and inconsistent with the record, does not vary with the particular issues that the sources' opinions relate to. "In evaluating the opinion of medical sources on issues reserved to the Commissioner," such as a claimant's RFC and ability to work, "the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) and 416.927(d)." SSR 96-5p, 61 F.R. 34471, 34473 (July 2, 1996). For example, a medical source statement, such as that which Dr. Belchic provided in this case, is a medical opinion about what an individual can do despite a severe impairment. *See id.* at 34474. Despite the close resemblance of medical source statements to an RFC assessment, an issue reserved exclusively to the Commissioner, an ALJ "must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 and 416.927, providing appropriate explanations for accepting or rejecting such opinions." *Id.* at 34475. Furthermore, medical source statements may be entitled to controlling weight. *See id.* at 34474-5. In short, the Commissioner's regulations and rulings show that ALJ's are required to fully explain the weight and consideration given to treating sources' opinions, regardless of why the ALJ feels that they might be entitled to little or no weight.

Turning to the ALJ's discussion in this case, it includes only one paragraph dealing with the medical evidence pertaining to Williams' RFC and addresses Dr. Belchic's opinion on the subject with the following sentence: "His primary care physician reported extreme limitations in a medical statement of ability to do work related activities." Tr. 17. Immediately following this paragraph, the ALJ acknowledged that treating sources' opinions are normally afforded considerable weight, but then discussed several exceptions to this rule when good cause is shown, i.e., when the opinion is brief and conclusory, unsupported by other medical evidence, or is otherwise unsupported by the evidence. Tr. 17. That, however, is the end of the ALJ's discussion of the medical evidence and Williams' treating sources' opinions, particularly Dr. Belchic's. The ALJ did not apply the standards he recited, nor did he discuss the applicable factors for evaluating treating sources' opinions under 20 C.F.R. § 404.1527, and contrary to the Commissioner's claim, it is not apparent that the ALJ concluded that Dr. Belchic's opinion fell into a particular exception. Furthermore, even if it were apparent, it is not enough that the ALJ concluded that Dr. Belchic's opinion was unsupported by or inconsistent with other physicians' opinions and medical evidence. The SSRs discussed above clearly demonstrate that such opinions are still entitled to deference and consideration under section 404.1527. Although the ALJ cited Dr. Simonton's more favorable opinion of Williams' limitations and characterized Dr. Belchic's opinions of Williams' limitations as "extreme," this hardly qualifies as "good reasons" for the weight afforded to Dr. Belchic's opinion, or even what that weight may have been. Therefore, it is recommended that the Commissioner's denial of benefits be **REVERSED and REMANDED for full consideration of the opinion of Dr. Belchic and other treating sources.**

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 27th day of January, 2006.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE